Estate of Frank M. Gould, deceased, Bank of New York, and Paul J. Longua, Executors, v. Commissioner.
Estate of Frank M. Gould v. Commissioner
Docket No. 10402.
United States Tax Court
1947 Tax Ct. Memo LEXIS 152; 6 T.C.M. (CCH) 775; T.C.M. (RIA) 47176; June 30, 1947
*152 John G. Jackson, Jr., Esq., for the petitioners. Clay C. Holmes, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: This proceeding involves a gift tax deficiency in the amount of $253,501.77 for the year 1944. Two issues are raised: (1) Whether any part of a lump-sum payment made by Frank M. Gould (hereinafter referred to as decedent) to his wife, pursuant to a separation agreement which was incorporated into a divorce decree, is taxable as a gift. (2) Whether additions made in 1944 to a trust created for the benefit of two minor beneficiaries were gifts of future interests against which no exclusions are allowed. Many of the facts have been stipulated or admitted in the pleadings. Findings of Fact The stipulated and admitted facts are hereby found accordingly. Bank of New York and Paul J. Longua, are executors of the petitioner estate, the decedent having died on January 13, 1945. The gift tax returns involved were filed with the collector of internal revenue for the second district of New York. Decedent married Florence B. Gould in 1924. There were two children of this union, a daughter, Marianne, born in 1925, *153 and a son, Edwin Jay, born in 1932. Decedent and his wife lived together from the time of their marriage until July, 1942, when they commenced to live separate and apart. The separation was occasioned by serious differences that arose between them and was finally culminated in a divorce, secured by the wife in Reno, Nevada on May 6, 1944. Prior to the divorce, on January 24, 1944, the parties entered into a separation agreement wherein it was provided, inter alia, that the parties relinguished all claims or rights that either might have in the other's estate, and that upon the securing of a divorce, the decree was to provide that the agreement had settled all claims between the parties and thereupon the decedent - "* * * delivered to first party [decedent's wife] his check for $586,000, receipt whereof is hereby acknowledged, and (b) agrees to deposit with BANK OF NEW YORK, in escrow, the sum of $250,000, to be held by it under the following terms and conditions: In the event that it is finally determined that a gift tax is assessable against the second party [decedent] by reason of this separation agreement or any payments made hereunder, an amount sufficient to satisfy *154 any liability so established shall be paid over by said depositary to the appropriate authority, and any balance remaining in said fund or the whole thereof, when and if it be finally determined that there is no such liability, shall thereupon be paid to first party, less any tax thereon." There was also a payment of $14,000 by decedent to his wife, not now challenged by respondent, to cover expenditures by the wife "for the support of herself and their children in excess of amounts furnished to her" by decedent. At that time, decedent was 45 years of age; his wife, 41. Decedent's life expectancy under the American Experience Table was 24.54 years His wife's life expectancy under the same table was 27.45 years. In the divorce decree, the agreement was "approved, ratified, confirmed and adopted," and the sum of $586,000 was shortly thereafter delivered to the wife; the sum of $250,000 was retained in escrow. In his deficiency notice, respondent determined that the payment of $586,000 constituted a taxable gift. Upon stipulation, respondent conceded that of this payment, $306,630 is the value of the wife's right to support and maintenance, and hence not subject to gift tax. *155 Respondent has computed this as the present worth of a payment of $30,000 each year until the death of a man aged 45 years or the earlier death or remarriage of a woman aged 41 years, to wit, a period of 10.22 years. During the negotiations, looking to an amount to be paid by decedent to his wife for her support and maintenance, which commenced in December, 1942, each was represented by counsel who attempted to secure the most favorable settlement for his client. After much bargaining, a lump-sum settlement was finally agreed upon, which was to be in lieu of monthly payments for support and in satisfaction of decedent's obligation therefor. No mention was made during the negotiations as to payment for the wife's right, if any, in decedent's estate. Decedent was a man of extreme wealth, having inherited $10,000,000 in 1933 and $2,250,000 additional in 1938. His gross estate, as reported for Federal estate tax purposes, was approximately $12,500,000. At the time of the consummation of the separation agreement, his securities alone were of a value in excess of $8,000,000. His income from 1933 to 1944, inclusive, averaged about $650,000 per year, of which less than one-fifth was taxable. *156 From 1937 to 1942, approximately $400,000 per year was spent on family living expenses, exclusive of $50,000 per year for decedent's own purposes. Decedent owned such properties as a large estate at Oyster Bay, Long Island, a home on Jeykll Island, Georgia, a shooting lodge in Maine, a yacht, and race horses; he employed a number of servants and others, such as hunting guides, gardeners, and ship crew. He and his wife travelled widely and entertained extensively. For some years prior to July 1942, when the parties seperated, decedent's wife received each year approximately the following amounts: Income from her personal estate
$ 2,674
Income from trust of 1934
36,144
Income from trust of 1935
19,525
Allowance from decedent
90,000
$148,343
The 1934 trust in the amount of $1,000,000 was created by decedent and provided that all of the income was payable to the wife "during the period of her natural life or until such time as she shall cease to be my wife during my lifetime." The 1935 trust was approximately $500,000, the income of which was payable to decedent's wife for her life. Roughly, 80 percent of the income of the 1934 trust was nontaxable; 75 percent *157 of the income of the 1935 trust was nontaxable. The allowance of $90,000 per year, consisting of monthly payments of $7,500, constituted a part of the aforementioned $400,000 spent for family living. About one-half was used by the wife for her personal expenses; the remainder, for part of the household expenses. Upon their separation, in order to accelerate action by the wife with regard to a divorce, as decedent contemplated remarriage, among other reasons, decedent advised his wife that as of July 31, 1942, monthly payments would be reduced to $5,000. On October 20, 1942, decedent further reduced the monthly payments again this time to $2.500. This continued until the end of February, 1943. No payment was made in March; $1,000 was paid in April, and from May, 1943, to May, 1944, $1,500 monthly was paid. In addition, decedent did pay certain living expenses of his wife and children in the following amounts: April-December, 1942
$32,563.33
January-December, 1943
28,679.09
January-May, 1944
16,088.68
Although she did not protest at the outset, decedent's wife in November, 1942, retained counsel to protect her interests, and through him, protested the reduction *158 in monthly allowances, and also commenced negotiations which culminated in the consummation of the separation agreement and the subsequent divorce, after which decedent remarried; decedent's wife remarried in April, 1945. The fair value of the obligation of decedent to his wife for her support and maintenance was not less than $586,000. The second issue arises out of additions of slightly over $25,000 made in 1944 by decedent to a trust created by him of which Longua's two minor sons were beneficiaries, and Longua, the trustee. By the terms of the trust instrument the corpus was to be divided into two equal parts, each to be held as a separate trust for each son. The trustee was to "apply so much of the net income" of each trust as he should "think necessary or proper to the support, education and use" of each of the beneficiaries, "or in the discretion of the Trustee, to pay over the net income to his lawful guardian, and to accumulate all income not so applied or paid over," until the beneficiaries and each of them "shall reach the age of twenty-one (21) years." Upon each beneficiary's reaching the age of 21 years, the trustee was to pay over to him absolutely all accumulations *159 of income, and was to continue to hold the principal of the separate trust fund for his benefit and pay over the net income to him directly, or, in the discretion of the trustee, to apply the same to his use and benefit, until the trust should terminate upon each beneficiary's reaching the age of 30 years or upon his death prior thereto. In event of termination by death, principal was to distributed in equal shares to the beneficiary's children then living; but if no children survived, then it was to be added to the interest of the other beneficiary. Respondent, in a statement attached to the notice of deficiency, determined: "* * * the terms of the trust created for the benefit of Paul Longua and Hubert L. Longua provide that until the beneficiaries attain the age of 21 years the trustee shall pay them only such portion of the income as the trustee in his uncontrolled discretion feels necessary and proper. Accordingly these donees did not receive the unrestricted right to the immediate use, possession or enjoyment of the income or corpus of the trust and these gifts are gifts of future interest against which no exclusions are allowable." The additions made in 1944 to the trust *160 constituted gifts of future interests to the beneficiaries. Opinion Decedent's wife received from him during marriage about $45,000 annually for her personal expenses. Respondent's concession, based on the last year of marriage is $30,000, but this was evidently reduced to an exceptionally low figure for trading purposes. In addition, she stood to lose trust income of $36,000 a year if she consented to the divorce. But the former item alone for the 24-1/2 years of decedent's life expectancy justifies a present value for the pre-divorce obligation of support of a figure in excess of the settlement made. There seems little likelihood that a divorce court in litigated separation proceedings would have awarded as little as the $300,000 which respondent concedes. Coupled with the arm's length nature of the negotiations and the ultimate agreement of the parties themselves, we have no question as to the adequacy of the consideration received by decedent for the transfer. See . There need be added here no factor for the wife's prospect of remarriage. Cf. , affirmed (C.C.A., 2nd Cir.) . *161 Had there been no agreement there would have been no divorce, and of course not even an actuary's theoretical expectation of remarriage. The limiting factor is only decedent's life expectancy, since the wife's was greater than his. On this point respondent's determination is disapproved. On the remaining issue, the gifts in question seem to us to have constituted future interests and hence to be entitled to no exclusion. As we construe the powers of the trustee under the instrument, his discretion as to payment or accumulation unlike the Sharp case [1], was absolute, . It seems doubtful if the power, - and it was no duty, - to "pay over" to the beneficiaries' guardian was really intended to cover more than expenditures for support and education which the trustees thought the guardian should disburse. In any event, evidence of the anticipation that all income should be paid out immediately for the present enjoyment of the beneficiaries is conspicuously lacking. See . And if there was some irreducible minimum of the present benefit for which the donees were given immediately, we have been furnished *162 with no evidence from which to compute it. . On this point respondent is sustained. Decision will be entered under Rule 50. Footnotes
1. , affirmed (C.C.A., 9th Cir.) .↩